IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAMES SAYLOR, | | |
| Plaintiff, | | **4:12CV3115** |
| v. | | |
| RANDY KOHL, M.D.; DENNIS BAKEWELL, ROBERT HOUSTON, NATALIE BAKER, M.D.; MOHAMMAD KAMAL, M.D.; CAMERON WHITE, PhD.; MARK WEILAGE, PhD.; FRED BRITTEN, KARI PEREZ, Ph.D.; and  CORRECT CARE SOLUTIONS, LLC, | | **MEMORANDUM AND ORDER** |
| Defendants. | | |

This matter is before the court on a motion for summary judgment filed by defendants Dennis Bakewell, Fred Britten, Robert Houston, Randy Kohl, Kari Perez, Mark Weilage, and Cameron White, in their official and individual capacities, and by Mohammad Kamal, M.D. in his official capacity, having been served only in his official capacity.  Filing No. 141.[1]  This is an action for violations of constitutional rights filed by an inmate under 42 U.S.C. § 1983.  The defendants are Nebraska Department of

---

[1] Also pending are a motion to defer or deny summary judgment, Filing No. 166, a motion to reopen summary judgment, Filing No. 174, and a motion for leave to file a reply brief, Filing No. 175.  The plaintiff's motion to defer or deny summary judgment, Filing No. 166, has been rendered moot by this disposition.  The magistrate judge granted an earlier motion to reopen that was not opposed by the defendants.  Filing No. 170, Order.  Defendants have not responded to the most recent motion to reopen.  The court finds the latest motion to reopen should similarly be granted and attached materials deemed filed instanter. (Filing No. 174-1 to 174-11).

The motion for leave to file a reply brief will also be granted and the attached proposed reply brief (Filing No. 174-1) deemed filed instanter.  The court has considered the proposed submissions in connection with this motion.

Correctional Services ("DCS") employees, officials or contractors.[2]   This court has jurisdiction under 28 U.S.C. § 1331.

In response to defendants' earlier motion to dismiss, the court found claims against the State of Nebraska and DCS and against individual defendants in their official capacities were barred by sovereign immunity.  Filing No. 124, Memorandum and Order at 11-12.  The court also dismissed the plaintiff's state law negligence claim. *Id.*  The plaintiff's claims for equitable relief against the defendants in their official capacities and his monetary damages claims against the defendants in their individual capacities remain pending.

In his complaint, the plaintiff generally alleges that the defendants were deliberately indifferent to his serious medical needs in failing to properly treat him for Posttraumatic Stress Disorder ("PTSD").  He also alleges the defendants violated his due process rights and retaliated against him by transferring him to Tecumseh State Correctional Institute and reclassifying him.  He asserts violations of his First, Eighth, and Fourteenth Amendment rights.[3]

The defendants deny the plaintiff's allegations.  Defendants Randy Kohl, M.D., Cameron White, Ph.D., Mark Weilage, Ph.D., Robert Houston, Fred Britten, Dennis Bakewell, Kari Perez, Ph.D., and Mohammad Kamal, M.D., move for summary

---

[2] Correct Care Solutions, Inc., ("CCS") contracts with the state to provide psychiatric care to inmates.  *See* Filing No. 124, Memorandum and Order at 2.

[3] The plaintiff's allegations are summarized in greater detail in the court's order on the defendant's motion to dismiss.  Filing No. 124, Memorandum and Order at 1-5; *see Saylor v. Nebraska*, No. 4:12cv3115, 2013 WL 6036630, *2-3 (D. Neb. Nov. 13, 2013).  Some additional relevant facts are set forth in the opinion of the District Court of Lancaster County, Nebraska, in *Saylor v. State of Nebraska*, No. CI 05-1597 (March 31, 2010); Filing No. 143-18, Index of Evid., Ex. 16 (hereinafter, "the State tort action").

judgment, arguing they are immune from suit by reason of qualified immunity.  They also assert that any claims alleging violations that occurred before June 8, 2008 are barred by the four-year statute of limitations under 42 U.S.C. § 1983.  They further argue that the defendants' statement of undisputed facts should be deemed admitted because of the plaintiff's failure to follow the local rules and also contend that they are entitled to summary judgment because the plaintiff "has wholly failed to substantiate any of his allegations with probative evidence, as is required at this stage of the proceedings."  *See* Filing No. 173, Reply Brief at 11.

I.   FACTS

In their brief in support of their motion, defendants set out 162 numbered paragraphs of ostensibly undisputed facts.  Filing No. 145, Defendants' Brief at 4-26.  In several responses, the plaintiff explicitly controverts over 100 of these supposedly undisputed facts.  *See* Filing No. 163, Plaintiff's Brief at 5-10; Filing No. 165-1, Supplemental Response at 1-15; Filing No. 174-1, Proposed Supplemental Response at 1-20.  (Specifically, the plaintiff only admits ¶¶ 1-7, 9-14, 17-22, 24-28, 37, 39-41, 43-48, 51-57, 59-63, 65-66, 68-78, 120-128, 150-152, 154-55, and 158-59).  For the most part, the agreed-upon facts are either irrelevant or only marginally relevant and not dispositive of the issues before the court.

The defendants also submit their affidavits and other documentary evidence in support of the motion.  Filing No. 143, Index of Evid., Exs. 1-16.  The evidence includes DCS records relating to Saylor's transfer and reclassification, correspondence to and from Saylor (a/k/a "kites"), minutes of an August 5, 2010, multidisciplinary meeting

3

regarding Saylor, Saylor's medical records, and the order in Saylor's state tort action. *Id.*, Exs. 8-16; *see supra* at 2 n.3.

That evidence shows that defendant Randy Kohl, M.D., is a board-eligible family physician and is the DCS medical director. Filing No. 143-1, Index of Evid., Ex. 1, Affidavit of Randy Kohl. Dr. Kohl directs and coordinates diagnostic and therapeutic services to improve and maintain the health of inmates within DCS and oversees all health care within DCS. *Id.* at 2. He states he is familiar with the facts of this case and has reviewed the medical records of treatment provided to Saylor. *Id.* DCS records show that Saylor was transferred to Tecumseh State Correctional Institution on September 14, 2010. He states that Saylor's mental health treatment needs were discussed by a team of professionals at a multidisciplinary meeting on August 5, 2010. *Id.* at 3. Dr. Kohl states that the rationale for Saylor's transfer was his need for continuity of care, as Dr. Christensen's contract with NDCS had ended and Saylor refused to work with Dr. Kamal who was the only psychiatrist for the Nebraska State Penitentiary. *Id.* The team determined that placement at Tecumseh would provide Saylor with a stable psychiatric provider—Dr. Natalie Baker, a psychiatrist employed by CCS. *Id.* at 3. He further states that, in his opinion, to a reasonable degree of medical certainty, there was no departure by DCS or CCS medical or psychiatric staff from generally recognized standards of care in any respect. *Id.* at 5.

Defendant Cameron White, Ph.D., states in his affidavit that he has been the Behavioral Health Administrator for DCS since 2004. Filing No. 143-2, Index of Evid., Ex. 2, Affidavit of Cameron White, Ph.D., at 1. Dr. White coordinates the DCS's mental health, substance abuse, social work, sex offender, and psychiatry services to ensure

4

that DCS meets required community standards for behavioral health treatment. *Id.* at 1.
He was not personally involved in Saylor's treatment but is familiar with his case. *Id.* at
2-3. He states that Saylor's mental health records indicate that Saylor was diagnosed
with Post-Traumatic Stress Disorder ("PTSD") in 2005 by Dr. Glenn Christensen. *Id.* at
2. Dr. Christensen's contract with DCS ended on May 8, 2010. *Id.* He states that the
rationale for Saylor's transfer was to ensure consistency of psychiatric services, which
could only occur at Tecumseh at that time, due to changes in psychiatric staffing at the
Nebraska State Penitentiary ("NSP"). *Id.* at 3. He also states that "[a]t no time was
mental health care withheld, nor was Inmate Saylor ever improperly treated for any of
his mental health conditions." *Id.* Further, he opines

> to a reasonable degree of psychological certainty that the care offered and
> provided to inmate Saylor by the mental health staff at NSP and TSCI was
> at all times in compliance with the generally recognized standards of
> applicable care in Lincoln and Tecumseh Nebraska, or similar
> communities for mental health providers who attend to patients under
> circumstances the same as, or similar to, those in the case of inmate
> Saylor.

*Id.*

In his affidavit, Mark Weilage, Ph.D., states that he is the assistant behavioral
health administrator for mental health for DCS and has been since December 2005.
Filing No. 143-3, Ex. 3. He attests to the accuracy of Saylor's mental health records.
*Id.* at 2. Dr. Weilage is a clinical psychologist and states that he is familiar with Saylor's
case and had contact with Saylor while Saylor was incarcerated at the NSP to assess
him for anxiety and to determine treatment interventions, as appropriate. *Id.* at 2. He
also states that he was present at the multidisciplinary team meeting held on August 5,
2010, at which Saylor's mental health needs were discussed and his transfer to

5

Tecumseh was considered. *Id.* at 3.  He also states that the rationale for the transfer was to ensure consistency of psychiatric services. *Id.*  Further, Dr. Weilage states that he conducted approximately half a dozen routine follow-ups with Saylor when he was housed at Tecumseh. *Id.*  He also states the opinion that

> Based upon [his] personal knowledge of the facts in this case, upon [his] review of the patient's mental health records, and upon [his] experience and training, it is [his] opinion to a reasonable degree of psychological certainty that the care offered and provided to inmate Saylor by the Mental Health staff at NSP and TSCI was at all times in compliance with the generally recognized standards of applicable care in Lincoln and Tecumseh Nebraska, or similar communities for mental health providers who attend to patients under circumstances the same as, or similar to, those in the case of Inmate Saylor.

*Id.* at 4.

Defendants also submit the affidavit of Robert Houston, former director of DCS, who is now retired. Filing No. 143-4, Index of Evid., Ex. 4, Affidavit of Robert Houston at 1.  As the director of DCS, he had authority over the administration of the DCS its staff and inmates. *Id.* at 2.  He states it is the policy of DCS that inmates be provided unimpeded access to health care services. *Id.*  He relates that NSP has been accredited by the American Correctional Association ("ACA") since 1981 and the Tecumseh Correctional Institution has been accredited since 2003. *Id.* at 2.  He also sets out certain ACA standards for mental health care. *Id.* at 3.  He states that he was "in no way personally involved in inmate Saylor's medical or mental health care." *Id.* at 3.

Fred Britten, who was employed as Warden of Tecumseh for DCS from July 2000 to April 2013, states in his affidavit that as part of his duties, he operated a large prison that housed all classifications of inmates other than those who were community-

6

based. Filing No. 143-5, Index of Evid., Ex. 5, Affidavit of Fred Britten at 1. *Id.* He oversaw the administration of personnel and programs to ensure a safe, efficient lawfully functioning prison. *Id.* at 2. He states he was familiar with the facts of the case and has reviewed records regarding Saylor's classification and custody levels while at Tecumseh. *Id.* He states that his only involvement with the case was regularly attending institutional classification committee meetings regarding Saylor. *Id.* The institutional classification committee reviews all classification recommendations to the Warden. *Id.* at 2. He states that the majority of institutional classification committee hearings regarding Saylor were held for segregation status reviews or to consider reclassification while he was in the Special Management Unit ("SMU") at Tecumseh. *Id.* at 3. Further, he states that "'administrative segregation' is an umbrella term used to describe the removal of an inmate from general population for an indefinite period of time to maintain order and security within the institution." *Id.* He states that administrative segregation is not disciplinary segregation—it includes administrative confinement, intensive management, protective custody, and transition confinement. *Id.* at 4. He also states that inmates are given notice of segregation status review and have an opportunity to appear before the unit classification committee. *Id.*

Warden Britten also states that on September 14, 2010, when Saylor was transferred to Tecumseh from NSP, Saylor was initially supposed to be placed in protective custody as per his request. *Id.* at 5. However, Saylor was immediately placed in the hospital on arrival due to an attempt to hang himself. *Id.* Britten also states that all inmates in the SMU are in single cells. *Id.* On September 20, 2010, Saylor was placed on immediate segregation in the SMU for refusing to move to the

7

Protective Custody Unit.  *Id.*  Britten states "immediate segregation" is "the immediate confinement of an inmate to protect staff, other inmates, the inmate being confined, or to maintain the security management and control of the institution pending a classification or disciplinary action and/or investigation."  *Id.*  On September 28, 2010, the unit classification committee held a hearing and recommended that the institutional classification committee place inmate Saylor on administrative confinement.  *Id.* at 6. He explains that "being placed on a ministry of confinement would allow inmate Saylor to be housed on the special management unit, which only allows one inmate per cell, which seemed appropriate, given inmate Saylor's fears of other inmates."  *Id.*  Britten approved placing Saylor on administrative confinement on September 30, 2010, based on the Unit Classification Committee's reasoning.  *Id.* at 6.  On October 14, 2010, the institutional classification committee and Britten approved removing Saylor from administrative confinement and placing him in protective custody, where he could be housed with another inmate.  *Id.* at 7.  On October 28, 2010, Saylor was again placed on immediate segregation and housed in the SMU because he stated he feared for his safety in protective custody.  *Id.*  On November 10, 2010, the institutional classification committee and Britten approved placing inmate Saylor on administrative confinement, where he remained housed in the SMU for the remainder of his time at Tecumseh.  *Id.* at 7.  Warden Britten also states that "at no time was he personally involved in Saylor's medical or mental health care."  *Id.* at 8.  Warden Britten authenticated the documents and copies of documents marked as Exhibit 8.  *Id.*; see Filing No. 143-8, Index of Evid., Ex. 8, inmate reclassification forms and segregation status forms.

Dennis Bakewell, the Warden of NSP from May 2006 until September 2011 and Warden of the Diagnostic and Evaluation Center D&E from September 2011 until April 2013, testified by affidavit that he too is familiar with the facts of the case.  Filing No. 143-6, Index of Evid., Ex. 6, Affidavit of Dennis Bakewell at 1-2.  He states that his only personal involvement with the case dealt with the transfer of Saylor from NSP to Tecumseh on September 14, 2010.  *Id.* at 1.  He states that inmates who need mental health care beyond the resources available in their facility, as determined by the responsible physician, are transferred under appropriate security provisions to a facility where such care is available.  *Id.* at 3.  He states that he attended the institutional classification committee hearing and reviewed documents regarding Saylor's mental health treatment needs.  *Id.*  He recalls reviewing a document provided by DCS mental health staff that indicated that Saylor refused to work with DCS psychiatrist, Dr. Mohammed Kamal who was the only psychiatrist available at NSP at the time.  *Id.*  He, too, testified that the rationale for transferring Saylor was to ensure consistency of psychiatric services.  *Id.*  Warden Bakewell testified that he had the authority to make the final decision at the institutional level regarding Saylor's transfer from NSP to Tecumseh.  *Id.* at 4.   He also states that an inter-institution transfer is not a reclassification action.  *Id.*  Saylor maintained his same custody level and administrative segregation status when he was transferred from NSP to Tecumseh.  *Id.*  Like the other correctional officials, Bakewell states that "at no time was he ever personally involved in Saylor's medical or mental health care."  *Id.*  Bakewell also authenticates the documents in Exs. 9 and 10.  *Id.* at 4; *see* Filing No. 143, Index of Evid., Ex. 9, inmate transfer order,  & Ex. 10, inmate reclassification.

In her affidavit, Kari Perez, Ph.D., states that she was a clinical psychologist supervisor at NSP from September 2005 until March 2012. Filing No. 143-7, Index of Evid., Ex. 7, Affidavit of Kari Perez, Ph.D. As clinical psychologist supervisor, Dr. Perez supervises mental health services at NSP, including supervising the clinical activities of mental health practitioners. *Id.* She provided assessments and psychological evaluations of inmates and assisted in the development and quality assurance of mental health treatment programs. *Id.* She states that she is familiar with the facts of the case and her involvement in the case was supervising the license mental health practitioners who worked with Saylor. *Id.* She states she would consult with the licensed mental health practitioners and sign off on the segregation mental status reviews and other forms regarding Saylor. *Id.* She further states that she also attended many of Saylor's institutional classification committee hearings while he was incarcerated at NSP. *Id.* She states, however, that she did not directly treat or work with inmate Saylor, with the exception of meeting with him one time to address difficulties that one of the licensed mental health practitioners was having treating him. *Id.* at 2. Further, she states she was involved in the August 5, 2010, multidisciplinary team meeting where Saylor's mental health treatment needs were discussed and his transfer to Tecumseh was considered. *Id.* She further states the rationale for transferring Saylor was to ensure consistency of psychiatric services. *Id.* She authenticates the minutes of the August 5, 2010 meeting. *Id.* at 3*; see* Filing No. 143-11, Index of Evid., Ex. 11, Meeting Minutes. The meeting minutes show that Dr. Kamal was also at the meeting. Id., Ex. 11, Meeting Minutes at 1.

Dr. Perez also states that all mental health staff under her supervision who treated Saylor acted properly with in the standards of the medical community. *Id.* at 3. She states Saylor received consistent and appropriate psychological treatment from the licensed mental health practitioners under her supervision. *Id.* She further opines, to a reasonable degree of psychological certainty, that

> the care provided by the NSP psychological and mental health staff were at all times during inmate Saylor's care in compliance with the generally recognized standards of applicable care in Lincoln, Nebraska, or similar communities for hospitals who attend to patients under circumstances the same as or similar to, those in the case of inmate Saylor.

*Id.* at 3.

Other documentary evidence submitted in support of the defendants' motion shows that Lancaster County, Nebraska, District Court (hereinafter, "the state court") found in March 2010 that from June 2002 to November 2005 Saylor had not been provided with necessary treatment for PTSD in a timely fashion. Filing No. 143-18, Index of Evid., Ex. 16, state tort action Order at 35. The state court found, however, that the treatment provided to Saylor between November 2005 and the date of the trial in early 2010 complied with the applicable community standard of care for PTSD. *Id.* That treatment plan included seeing a therapist for cognitive behavioral treatment at least every other week and seeing a psychiatrist every 2 to 3 months, plus medication including an SSRI and a benzodiazepine and EDMR therapy. *Id.* at 24-26. The court further found that DCS's responses to Saylor's "kites" and 90-day mental health reviews did not satisfy Dr. Kamal's earlier recommendation that Saylor be "closely and regularly" monitored. *Id.* at 34. The court was persuaded that PTSD is a very complicated and serious condition that requires more than passing treatment or therapy and credited

11

Saylor's testimony that his flashbacks, which started in 2000, became worse over the years.  *Id.* at 34-35.  It found the flashbacks interfered with his thinking and caused physical pain.[4]  *Id.* at 37-38.  Saylor was awarded $250,000 in damages in the action. *Id.* at 38.

In opposition to the defendant's motion, the plaintiff submits his own affidavits and the affidavit of Glenn Christensen, M.D.  *See* Filing No. 162-1, Ex. A, Affidavit of James Saylor ("Saylor Aff. I"); Filing No. 167-1, Index of Evid., Ex. A, ("Saylor Aff. II"); Filing No. 174-3, Supplemental Index of Evid., Ex. D, Affidavit of Glenn Christensen, M.D. ("Dr. Christensen Aff.").  Saylor also submits certain administrative regulations and evidence submitted in his state tort case.  *See* Filing No. 174-2, Supplemental Index of Evid., Exs. E to L.

In his affidavit, the defendant makes several salient assertions.  He states that he has suffered from PTSD since 2002, as a result of being sexually assaulted by several inmates while an inmate at LCC, a DCS facility.  Filing No. 162-1, Saylor Aff. I at 1-2. As a result, he repeatedly experiences headaches, flashbacks, extreme fear, anxiety, panic attacks, insomnia, nightmares, fatigue, inability to concentrate, and is incapable of sharing a cell with any other inmates.  *Id.* at 2.  Further, he states that Defendants Dr. Kohl, Dr. White, Dr. Weilage, Dr. Kamal, Dr. Perez, Dr. Baker, Warden Bakewell, and Warden Britten have indicated to him that they are aware that he suffers from PTSD

---

[4] Specifically, it credited his testimony that he only sleeps 3 or 4 hours a night and has a fear of being placed in a cell with another inmate.  *Id.* at 37.  He suffers from erectile dysfunction, phantom rectal pain, and is very anxious and describes himself as suffering from a panic disorder.  *Id.*  Further, the court found that prior to the assault, Saylor held the job; since the assault, due to being placed in protective custody, he has not had a job.  *Id.*  Since the assault, Saylor has not spent time in the yard and has not interacted with other inmates.  *Id.*  He fears being around other inmates.  *Id.*  He is only allowed out of his cell 1 hour per day.  *Id.*

and he states that they were "specifically and directly made aware" of his health care needs by virtue of the decision of the state tort action. *Id.* at 3. He was initially diagnosed with PTSD in 2005 and was treated by Dr. Glenn Christensen from the time of his diagnosis until April 2010. *Id.* He understood Dr. Christensen's treatment plan had three parts—regular psychotherapy, the prescription medications Seroquel and Klonopin, and a safe, stable routine. *Id.*

He asserts that shortly after the March 31, 2010, decision in his state tort case the defendants "returned to the indifferent pattern of behavior he had endured prior to November 2005." *Id.* He states that on April 21, 2010, Dr. Christensen told him he would no longer be receiving psychiatric care from Dr. Christensen because DCS had terminated its service contract. *Id.* at 5. Further, he states that he repeatedly asked for medical/health care from the defendants after March 31, 2010, but they have repeatedly refused to provide him with adequate care. *Id.* He states he requested care both in person, and through "kites."[5] *Id.* Saylor further states that the treatment plan for his PTSD devised by Dr. Christensen has been discontinued and interrupted. *Id.* Although he has been promised alternative treatment, he has been provided no such treatment and no such treatment plan has been developed. *Id.* Further, he states the medications prescribed for him by Dr. Christensen have been interrupted at various times, discontinued at various times, and administered improperly or erratically. *Id.* He also contends that the "safe environment" Dr. Christensen devised as part of his treatment has been destroyed. *Id.*

---

[5] The evidence submitted by the defendants substantiates that testimony. *See* Filing No. 143-12, Index of Evid., Ex. 12, responses to inmate interview requests.

With respect to the individual defendants, he asserts that since March 31, 2010, Dr. Kohl has failed to properly supervise and train Dr. Baker, Dr. Kamal, Dr. White, Dr. Weilage, Dr. Perez and CCS.  *Id. at 6.*  He states that Doctors Baker, Kamal, White, Weilage, Perez and CCS have all failed to provide him with a plan of treatment, psychotherapy and medications, and appropriate conditions of confinement.  *Id.*  He states that Dr. Baker also reduced, changed and rescheduled his medications.  *Id.*  He contends Dr. White participated in the termination of Dr. Christensen, refused to allow him to privately employ Dr. Christensen, and also failed to properly evaluate health care needs and to establish a suitable treatment plan.  *Id.*  He contends that Dr. Weilage also failed to properly evaluate his health care needs, and reneged on a personal promise made in the summer of 2010 to establish a treatment plan similar to Dr. Christensen's plan.  *Id.*  He also states that Dr. Perez has failed to properly supervise and train Dr. White, Dr. Weilage, and CCS and contends Correct Care similarly failed to supervise its employees as to the appropriate and proper administration of medications and the appropriate responses to erratic changes in medications.   Saylor's claims of inappropriate or deficient care are supported by Dr. Christensen's opinion, medical evidence in the record and the state court order.  *See* Filing No. 174-3, Index of Evid., Ex. D, Dr. Christensen Aff. at 3; Filing No. 143-13 to 143-17, Index of Evid., Exs. 12 to 15, Saylor's psychiatric records, mental health records, and mental health communications.

Saylor also states in his affidavit that on September 14, 2010, defendants took steps to transfer him to Tecumseh.  *Id.* at 7.  He states the transfer was physically and mentally traumatic and stressful.  *Id.*  He contends his PTSD became worse as a result

14

of the transfer and he suffered other physical injuries that required medical attention at the time. *Id.* Further, he states that, in his experience, his transfer to Tecumseh was not typical and was accomplished without notice, and resulted in, or was simultaneous with reclassification. *Id.*

Significantly, he contends he was housed in the Tecumseh SMU from October 2010 until early this year. *Id.* at 8. While housed at SMU, he had strict limitations on movement, limited access to visitors, and limited access to his property, including legal materials. *Id.* His privacy was also limited. *Id.* He states in his affidavit that he has "been held in administrative segregation since September of 2010 and have not been allowed meaningful review or hearing with regard to my classification or placement in segregation." *Id.* He states he was kept indefinitely on administrative segregation because of his PTSD. *Id.* He also details his efforts to obtain medical care and presents a timeline of events. *Id.* at 4-9.

In his affidavit, Dr. Christensen states that his opinion, to a reasonable degree of medical certainty, is that the failure to provide Mr. Saylor with monthly psychiatric consultations after Dr. Christensen's final session with him in April 2010 was detrimental to Saylor's condition and fell below the prevailing standard of care. Filing No. 174-3, Index of Evid., Ex. D, Dr. Christensen Aff. at 3. Similarly, discontinuation of Seroquel of Saylor, without first conducting further testing and in the manner in which it was discontinued, was also harmful to Saylor and fell below the prevailing standard of care. *Id.* Likewise, transferring Saylor to the Tecumseh State Correctional Institution and keeping him in the SMU for more than three years was harmful to Saylor and likely

15

exacerbated the symptoms of PTSD, particularly because he was left in extreme isolation. *Id.*

Dr. Christensen also states that Dr. Kohl terminated his contract to provide psychiatric services with DCS less than a month before his final session with Saylor and did not afford Dr. Christensen the opportunity to introduce Saylor to a new psychiatrist or otherwise help Saylor make a smooth transition of care to a new psychiatrist. *Id.* at 2. Dr. Christensen also states that as of April 21, 2010, there were psychiatrists other than Dr. Kamal who provided psychiatric care to DCS inmates in Lincoln facilities. *Id.*

Saylor also submits copies of administrative regulations as well as documents including operational memoranda on inmates' access to health care, and certain reclassification forms that were obtained in discovery in the state tort case. *See* Filing No. 174, Index of Evid., Exs. E to L.

The plaintiff has also submitted supplementary materials indicating that the records supplied by the state defendants are incomplete and therefore misleading and also offers a summary of incomplete documents. Filing No. 176-1, Affidavit of Terry Barber; Filing No. 176-3, Summary. Further, in controverting many of the defendants' ostensibly undisputed facts, the plaintiff has pointed out inconsistencies in the defendants' submissions. *See* Filing No. 176, Supplemental Response

II.   LAW

A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *see Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080 (2011); *Baribeau v. City of Minneapolis*, 596

16

F.3d 465, 474 (8th Cir. 2010); *Wilson v. Lawrence County,* 260 F.3d 946, 951 (8th Cir. 2001). A court is permitted to exercise sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Meehan v. Thompson,* 763 F.3d 936, 940 (8th Cir. 2014). District courts must make reasoned "findings of fact and conclusions of law" sufficient to permit meaningful appellate review of the qualified immunity decision. *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014).

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll,* 135 S. Ct. at 350 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll,* 135 S. Ct. at 350 (quoting *al–Kidd*, 131 S. Ct., at 2083). This doctrine gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. *Carroll,* 135 S. Ct. at 350. The officers' defense of qualified immunity is evaluated "from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation." *Gladden v. Richbourg,* 759 F.3d 960, 964 (8th Cir. 2014). "If, based on those facts, the officer reasonably failed to comprehend that he was violating a person's clearly established constitutional rights, he is entitled to qualified immunity from suit." *Id.* A plaintiff "must show that 'every reasonable official would have understood that what he is doing violates' a constitutional right" and "that the constitutional question was 'beyond debate.'" *Blazek*

17

*v. Iowa City*, 761 F.3d 920, 924 (8th Cir. 2014) (quoting *Ashcroft v. al–Kidd*, —— U.S. —— ——, 131 S. Ct. 2074, 2083 (2011) (internal quotation omitted)).  Courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'"  *Blazek*, 761 F.3d at 924 (quoting *Plumhoff v. Rickard*, —— U.S. ——, 134 S. Ct. 2012, 2023 (2014) (internal quotation and citation omitted)).  Nevertheless, the plaintiff "need not show that the 'very action in question has previously been held unlawful' to overcome qualified immunity, as long as the unlawfulness was apparent in light of preexisting law."  *Blazek,* 761 F.3d at 926; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

When summary judgment is sought on a defense of qualified immunity, the court inquires whether the party opposing the motion has raised any triable issue barring summary adjudication.  *Ortiz v. Jordan*, 131 S. Ct. 884, 889 (2011).  A successful claim of qualified immunity will generally "present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.'"  *Ortiz*, 131 S. Ct. at 892 (noting that "[c]ases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law"); *Pearson v. Callahan,* 555 U.S. 223, 237 (2009) (noting that the qualified immunity procedure is of little use in fact-bound cases).  "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law," however, "if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment."  *Turney v. Waterbury*, 375 F.3d 756, 759-760 (8th Cir. 2004) (quotations omitted); *see Iqbal*, 556 U.S. at 674

(noting that "determining whether there is a genuine issue of material fact at summary judgment is a question of law, but it is a legal question that sits near the law-fact divide").

An inmate "has a well-established right not to have known, objectively serious medical needs disregarded." *Fourte v. Faulkner County, Ark.*, 746 F.3d 384, 387 (8th Cir. 2014); *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976); *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) ("It is well established that the prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs.")  In order to support an Eighth Amendment claim for relief, plaintiff must show that defendants were deliberately indifferent, that is, that they knew of, and yet disregarded, an excessive risk of harm to plaintiff's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 827 (1994).  This principle also extends to an inmate's mental health-care needs. *See Steele v. Shah*, 87 F.3d 1266, 1270 (8th Cir. 1996) (noting psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988).

"Applying the deliberate indifference standard is a 'factually-intensive inquiry.'" *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014) (quoting *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118–19 (8th Cir. 2007)).  Whether an official was deliberately indifferent requires both an objective and a subjective analysis. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014); *Scott*, 742 F.3d at 339–40.

19

Under the objective prong, a plaintiff must establish that he suffered from an objectively serious medical need. *See Scott*, 742 F.3d at 340. To be objectively serious, a medical need must have been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir.1997)). Under the subjective prong, the plaintiff must show that an official "actually knew of but deliberately disregarded his serious medical need." *Id.* This showing requires a mental state "akin to criminal recklessness." *Scott*, 742 F.3d at 340 (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir.2006)).

As a result, the plaintiff "'must clear a substantial evidentiary threshold to show that [the defendants] deliberately disregarded [the plaintiff's] needs by administering an inadequate treatment.'" *Scott*, 742 F.3d at 340 (quoting *Meuir*, 487 F.3d at 1118). "Deliberate indifference is 'more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Fourte*, 746 F.3d at 387 (8th Cir. 2014) (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)); *see Scott* 742 F.3d at 340. Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference. *Jackson*, 756 F.3d at 1065-66; *Estelle*, 429 U.S. at 106. "An inmate must demonstrate that a prison doctor's actions were 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Jackson*, 756 F.3d at 1066 (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997)).

A supervisor may be held individually liable under § 1983 "if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Laganiere v. County of Olmsted*, No. 14-1088, 2014 WL 6610363, at *2 (8th Cir. Nov. 24, 2014) (quoting *Wever v. Lincoln Cnty.*, 388 F.3d 601, 606 (8th Cir. 2004)). Because there is no vicarious liability under Section 1983, supervisory defendants are liable only if they personally do something that violates an inmate's rights or if they are responsible for a systematic condition that violates the Constitution, or for a failure to intervene. *Livers v. Schenck*, 700 F.3d 340, 357 (8th Cir. 2012).

The statute of limitations for 42 U.S.C. § 1983 actions is governed by the limitations period for personal injury cases in the state in which the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Nebraska, § 1983 actions are limited by the four-year statute of limitations. Neb. Rev. Stat. § 25-207; *see Montin v. Estate of Johnson*, 636 F.3d 409, 412–13 (8th Cir. 2011). Although state law establishes the statute of limitations for § 1983 actions, federal law controls on the issue of when the statute of limitations begins to run. *Wallace*, 549 U.S. at 388; *Montin*, 636 F.3d at 413. The standard rule is that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief. *Wallace*, 549 U.S. at 388. Under that rule, the tort cause of action accrues, and the statute of limitations commences to run, when the plaintiff knew or should have known of the injury that forms the basis of the claim. *Id.* at 391. Accrual can be delayed under the continuing violations theory. *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 362 (8th Cir. 1997). A continuing violation does not excuse a plaintiff from complying with the applicable statute of limitations—it simply allows the plaintiff to include, in an initial

complaint, allegedly unconstitutional acts that occurred before the limitations period, provided that at least one of the acts complained of falls within the limitations period. *Id.*

III.   DISCUSSION

The court finds the evidence, viewed in the light most favorable to the plaintiff, demonstrates that there are genuine issues of material fact on whether the defendants were deliberately indifferent to his serious medical needs so as to violate the Eighth Amendment. There are genuine disputes concerning the predicate facts material to the qualified immunity issue that make summary disposition inappropriate.

The constitutional right at issue arises under the Eighth Amendment. Denial of medical care that results in unnecessary suffering in prison is inconsistent with contemporary standards of decency and gives rise to a cause of action under 42 U.S.C. § 1983. The duty imposed on government officials to provide medical care to prisoners under the Eighth Amendment has been firmly established since 1976.   The Eighth Circuit ruled as early as 1988 that psychological disorders may constitute a serious medical need.[6] Consequently, the right to be free of deliberate indifference to serious medical needs, including mental health needs, was clearly established at the time of the challenged conduct by the defendants. Existing caselaw that would have put a reasonable correctional officer on notice that failing to appropriately treat PTSD resulting from a prison sexual assault would pose a risk of harm to an inmate and that ignoring that risk could amount to deliberate indifference to serious medical needs.

There is evidence, if credited, that tends to show that plaintiff had an objectively serious medical need and that the defendants were subjectively aware of the plaintiff's

---

[6] *White v. Farrier*, 849 F.2d at 325.

22

condition.  The plaintiff has shown that the defendants were aware of facts that would lead to the inference that there was a substantial risk that the plaintiff would be harmed by failing to properly treat his PTSD.  The record shows the plaintiff repeatedly asked for more or different mental health treatment.   Evidence indicates the defendants were aware of the plaintiff's PTSD diagnosis.  The plaintiff's mental health care had been the subject of a state court action challenging the adequacy of mental health treatment afforded to plaintiff by the defendants.   The state court found the Department of Corrections had been negligent in failing to provide the plaintiff with appropriate health care after his May 2002 sexual assault.  Significantly, none of the defendants stated in their affidavits that they were not aware of the state court judgment.  By virtue of the state court judgment, the defendants had actual notice of the risk of harm or injury to this plaintiff as a result of defendants' earlier provision of inadequate care.  Evidence of that risk was adduced at the state court trial and defendants Kamal, Perez and Kohl actively participated in the trial.  Although the standard for negligence liability is not the same as the standard for deliberate indifference, there is evidence from which a jury could infer that the risk of harm was so "obvious" that ignoring it could amount to deliberate indifference.

There is no dispute that the plaintiff was placed in administrative segregation from October or November 2010 until early 2014.  The placement closely followed the state court judgment.   The psychiatrist who had been found to have treated him appropriately was terminated shortly after the state court judgment.  There is evidence to support the plaintiff's contention that the defendants returned to the inadequate mental health practices that predated 2005 and that had been found wanting by the

23

state court. The plaintiff has adduced evidence that the prison officials and medical personnel denied, delayed, and interfered with his medication regime.  Evidence also shows that the defendants also returned to the practice of not responding or inadequately responding to the plaintiff's kites.

There is evidence of personal involvement by all of the defendants in the allegedly unconstitutional conduct.   Dr. Kohl participated in Dr. Christensen's termination.   Dr. White attended the meeting that resulted in Saylor's transfer to Tecumseh and approved the decision.  Dr. Weilage was also present at the meeting and he personally treated Saylor.   The record shows Dr. Kamal also attended the meeting.  Dr. Perez supervised clinical activities and testified at trial in 2010.  She also signed off on segregation status reviews.   Warden Britten attended institutional classification meetings and approved administrative segregation for Saylor.  Warden Bakewell was involved in the transfer and had authority to make the final decision on the transfer.  Former Director Houston may not have personally participated in Saylor's medical treatment, but was responsible for prison policies and procedures and would have been aware of the specifics of Saylor's case from the state court action.

The claims against the individual defendants are not premised on vicarious liability, but on each defendant's personal knowledge of, and involvement in, unconstitutional acts.  There are factual disputes concerning the level of the supervisors' knowledge of the pattern of allegedly unconstitutional acts.  The plaintiff alleges, and has produced evidence that tends to show, that the supervisory defendants were aware of their subordinates' failure to properly devise and provide appropriate PTSD treatment, failure to properly dispense medication, or failure to provide appropriate conditions of

confinement, and knew this failure posed a substantial risk of harm to the plaintiff.  The state court findings provide evidence from which a jury could infer that the defendants had subjective knowledge of the plaintiff's condition and medical needs.

Resolution of the qualified immunity issue requires assessments of credibility that are not appropriate at this stage of the litigation.  There are disputes with respect to whether the defendants appreciated the seriousness of the plaintiff's condition or recognized the extent of the risk of harm to the plaintiff.  A jury crediting Saylor's evidence could find that the Director and Wardens actually knew that correctional officers had reverted to the conduct that the State court had found deficient and accordingly were on notice of the constitutional risk.  Although the evidence indicates that the defendants were aware of the findings of the state court, issues remain as to whether they had a subjective appreciation that failure to adhere to the medical treatment plan devised by Dr. Christensen would give rise to a serious medical need.  There is some evidence that the defendants knew, by virtue of the findings in the state tort action, that the circumstances of the plaintiff's isolation would exacerbate his condition.  The state court judgment put the defendants on notice of the parameters of appropriate community care.  Defendants' own evidence establishes that the DCS policy is to provide comprehensive health care services by qualified personnel to protect the health and well-being of the inmates.

There is also evidence that supervisory officials tacitly authorized the conduct of subordinates in failing to properly treat the plaintiff, transferring him to Tecumseh and placing him in isolation.  There is evidence from which a jury could infer that the supervisors' response to that knowledge was so inadequate as to show deliberate

25

indifference to or tacit authorization of the alleged offensive practices. The evidence shows a long-standing pattern of conduct that involved, at various times, medication mix-ups, treatment delays, inadequate responses to kites, arguably punitive transfers and lengthy segregation of the plaintiff. Supervisory defendants failed to respond in the face of numerous complaints by the plaintiff. The supervisors' continued inaction in the face of documented complaints could amount to evidence from which a jury could find deliberate indifference. The supervisors were aware that the plaintiff had been in isolation for extended periods of time. They were aware that the state court found the defendants had failed to closely and regularly monitor Saylor's condition.

This is not a case that involves a mere difference of opinion between the lay wishes of the inmate/patient and the professional diagnosis of the prison physician—there are conflicting expert opinions in the record with respect to the adequacy of care provided to the plaintiff. Though a difference of opinion between doctors on the adequacy of a treatment plan may not be conclusive, it illustrates the level of dispute over the predicate facts. Notably, because discovery was stayed pending resolution of this motion, the parties have not been deposed and subjected to cross-examination. The court is unable to afford much weight to the defendants'' sparse and self-serving affidavits.

The court finds there are material disputed facts from which a jury could conclude that defendants were either plainly incompetent or knowingly violated the proscription against being deliberately indifferent to an inmate's serious medical needs. The facts, when viewed most favorably to the plaintiff, would permit a reasonable jury to find that Saylor's PTSD was a serious medical need, and the importance of proper mental health

treatment was obvious from the diagnosis of PTSD, prescriptions for medication, and treatment that are reflected in medical records that were in the defendants' possession.

Based on the evidence, a jury crediting the plaintiff's testimony could find the defendants knew of and deliberately disregarded the plaintiff's need for proper medication and appropriate therapy to deal with the symptoms of PTSD. Viewing the evidence in the light most favorable to the plaintiff, a jury could find that the defendants' conduct violated Saylor's Eighth Amendment rights.

On this record, the court cannot find as a matter of law that the defendants are entitled to qualified immunity from suit for deliberate indifference to serious medical needs.[7] The court finds there are genuine issues of material fact on issues that form the predicate of a constitutional claim.

Further, the plaintiff's action is not barred by the statute of limitations. The record shows that the defendants' allegedly unconstitutional acts were part of a continuing violation that extends into the limitations period.

IT IS HEREBY ORDERED:

1.      Defendants' motion for summary judgment (Filing No. 141) is denied.

2.      Plaintiff's motion to defer or deny summary judgment (Filing No. 166) is denied as moot.

---

[7] The court's review of the evidence shows that there are numerous instances of inconsistencies between the institutional records and the affidavits of the defendants. For example, all of the defendants testified by affidavit that the reason for Saylor's transfer to Tecumseh was to provide him "continuity of care," but the reason stated in the transfer order is "institutional needs." *Compare* Filing No. 143, Index of Evid., Ex. -1 *with* Filing No. 143, Index of Evid., Ex. 9. (143-9). The plaintiff testified that Dr. Weilage told the plaintiff in September 2010 that Weilage would continue to treat him at Tecumseh, but the records show Weilage did not contact the plaintiff until nineteen months later. In addition, the testimonies of Britten and Bakewell are in conflict as to what is or is not a "reclassification action." These inconsistencies raise serious questions with respect to both the credibility of witnesses and the completeness and reliability of the records.

3.      Plaintiff's motion to reopen summary judgment (Filing No. 174) is granted; the amended Proposed Supplemental Response to Plaintiff's Amended Response to Movant's Statement of Material Facts (Filing No. 174-1), proposed index of evidence, (Filing No. 174-2), and supporting documentary evidence (Filing No. 174-3 to 174-11) are deemed filed instanter.

4.      Plaintiff's motion for leave to file a reply brief (Filing No. 175) is granted; the proposed Reply Brief is deemed filed instanter.

5.      Counsel for the plaintiff shall contact the chambers of U.S. Magistrate Judge Thomas Thalken within ten (10) days of the date of this order to schedule a telephone conference.

DATED this 22th day of December, 2014

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge